# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville October 13, 2015

## STATE OF TENNESSEE v. CHRISTOPHER SCOTTIE ITZOL-DELEON

### Appeal from the Criminal Court for Davidson County
### No. 2012-D-3022    Mark J. Fishburn, Judge

_____

### No. M2014-02380-CCA-R3-CD – Filed March 28, 2016

_____

The Defendant, Christopher Scottie Itzol-Deleon, was found guilty by a Davidson County Criminal Court jury of attempted aggravated sexual battery, a Class C felony, four counts of aggravated sexual battery, a Class B felony, and three counts of rape of a child, a Class A felony. *See* T.C.A. §§ 39-13-504 (2014) (aggravated sexual battery), 39-13-522 (2010, 2014) (rape of a child), 39-12-101 (2014) (criminal attempt). He received an effective forty-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to establish the element of penetration for rape of a child in Counts 3 and 4, (2) the trial court erred in allowing separate convictions for attempted aggravated sexual battery and rape of a child in Counts 1 and 3 and for rape of a child in Counts 4 and 5, (3) the court erred in permitting testimony regarding the Defendant's excessive drinking, (4) the court erred in admitting a letter written by the victim to her mother, (5) the court erred in not redacting a portion of the Defendant's statement to the police, (6) the court erred in admitting the victim's school photograph, (7) the court erred in sentencing the Defendant as a Range II offender relative to his rape of a child convictions, and (8) the judgment in Count 6 contains a clerical error. We merge Count 1, attempted aggravated sexual battery, with Count 3, rape of a child. Although we affirm the convictions, we remand the judgments for Counts 1 and 3 for entry of amended judgments reflecting merger of the offenses. We also modify the Defendant's sentences relative to Counts 3, 4, and 5 to twenty-five years in each count at 100% service. Finally, we remand the judgment in Count 6 for the correction of clerical errors.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Modified in Part; Case Remanded

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. TIMOTHY L. EASTER, J., filed a dissenting opinion.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Mary Kathryn Harcombe and Laura J. Getz (at trial), Assistant Public Defenders, for the appellant, Christopher Scottie Itzol-Deleon.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the Defendant's 2013 convictions for attempted aggravated sexual battery, four counts of aggravated sexual battery, and three counts[1] of rape of a child. The incidents occurred between October 2010 and June 2012 and involved the Defendant's stepdaughter, who was between ages nine and eleven during the relevant time period.

The Defendant, the victim's mother, and the victim moved to Nashville in 2009 when the victim was in the third grade. The victim initially lived with her biological father but rejoined her mother and the Defendant in October 2009. In October 2010, the family moved to a duplex on Scott Valley Road. The Defendant was incarcerated between October 2010 and January 2011 due to a driving under the influence (DUI) conviction. In April 2011, the victim's mother and the Defendant married. Due to the Defendant's drinking, the victim's mother and the victim moved to a home on Elissa Drive between June and September 2011, while the Defendant remained in the Scott Valley home. After September 2011, the victim's mother and the victim returned to the Scott Valley duplex and remained there until the family moved to a three-bedroom apartment in the Hickory Trace apartment complex in April 2012. In June 2012, the victim disclosed to her mother that the Defendant had sexually abused her.

The Defendant's convictions resulted from six incidents. Three of the incidents occurred in the Scott Valley home between September 2010 and April 2012. The first incident occurred while the victim watched the movie *Lemonade Mouth* and relates to Count 1, attempted aggravated sexual battery, and Count 3, rape of a child (*Lemonade Mouth* incident). The second incident occurred when the victim was looking for a "tank top" for her mother and relates to Counts 4 and 5, rape of a child (tank top incident). The third incident occurred when the Defendant showed the victim pornography and relates to Count 8, aggravated sexual battery (pornography incident). The fourth incident occurred at the home on Elissa Drive between June and September 2011 while the victim watched the movie *Night*

---

[1] The Defendant was convicted of four counts of rape of a child, but the trial court dismissed one count because it was based solely upon the Defendant's uncorroborated statement. See, e.g., *State v. Freeland*, 451 S.W.3d 791, 824 (Tenn. 2014) (prohibiting a criminal conviction based solely upon the defendant's uncorroborated confession).

*at the Museum* and relates to Count 9, aggravated sexual battery (*Night at the Museum* incident). The fifth, sixth, and seventh incidents occurred at the Hickory Trace apartment between April and June 2012. The fifth incident occurred when the victim was in the apartment's kitchen and relates to Count 6, aggravated sexual battery (kitchen incident). The sixth incident occurred when the victim searched for dog shampoo and relates to Count 10, aggravated sexual battery (dog shampoo incident). The seventh incident, which relates to Count 7 and did not result in a conviction, occurred while the victim watched the movie *Jennifer's Body* (*Jennifer's Body* incident).

## Evidence at Trial

The victim testified that at the time of the trial, she was age twelve and lived with her mother and younger sister. She said that she and her family moved to Hickory Trace when she was in sixth grade and that they later moved from a three-bedroom unit to a two-bedroom unit, although she could not recall when the move occurred. The victim stated that the Defendant was her stepfather and had lived with them in both units. The victim noted that when she was in the fourth and fifth grades, her family lived in the Scott Valley duplex.

The victim testified that she did not know how old she was when her mother and the Defendant began their relationship but that she remembered the three of them living together in California. The victim said that her mother, the Defendant, and she moved to Nashville when she was in the third grade and that she initially lived with her father. The victim rejoined her mother and the Defendant during the third grade. The victim stated that after she rejoined her mother, things were "[o]kay" and that she and the Defendant got along well. She said that she did not have any reason to be upset with the Defendant.

The victim identified on anatomical drawings the front genital area of a female and the penis of a male, and she referred to both areas as "private parts." She identified the buttocks as "butt."

### Lemonade Mouth Incident

The victim testified that the first memory she had of her and the Defendant's relationship changing occurred at the Scott Valley apartment while she was watching *Lemonade Mouth*. She said she woke up and saw a note from her mother on her television, which said that her mother had gone to work but that the Defendant was home. The victim stated that halfway through the movie, the Defendant entered her bedroom, sat behind her on the bed, and got under the blankets. The victim said she was lying under the blankets. She said that the Defendant began touching her thighs and waist with his hands and that he

attempted to remove her pajama pants. The victim stated that she moved on top of the blankets, that the room was cold because of the air conditioner, and that she returned under the blankets.

The victim testified that the Defendant removed her pajama pants while she was facing away from him and that she felt something on her back, which she assumed was his "private part." She clarified that she felt the Defendant's penis above her "butt." She said the Defendant was moving his penis "up and down like he was shaking it[.]" The prosecutor and the victim had the following exchange:

Q. Where . . . on your body could you feel his private part moving like that?

A. In between my thighs.

Q. Okay . . . . So when you're saying it's above your butt, you're sort of describing his private part being between your legs but outside of your [rectum]?

A. Yes.

. . .

Q. Okay. And so he's moving it back and forth toward your legs?

A. (Nodded affirmative[)].

Q. Okay. Did his private part touch any other part of your body while he was doing that?

A. A little bit on my private part.

. . .

Q. So you can feel it, could you also feel his private part on your butt?

A. Yes.

Q. Okay. Was it touching your butt on the inside or on the outside?

A. The outside.

The victim stated that the Defendant's penis slightly touched her private part but never went inside. She said she felt a watery or slimy substance on the outside of her private part that came from the Defendant's penis. The victim said that after she felt the substance, she got out of bed, that the Defendant entered the upstairs bathroom, that she saw him wipe his penis, and that she went downstairs, used the restroom, and felt burning when she urinated. The victim stated that this was the first incident she could remember. She said, however, she remembered that at the beginning of the incident, she felt as though she knew what was going to happen, which indicated to her this was not the first incident.

*Tank Top Incident*

The victim testified that during a second incident at the Scott Valley duplex, her mother was cooking and asked the victim to get a tank top from her mother's bedroom upstairs. The victim said she asked the Defendant if he knew the tank top's location, but he did not. The victim stated she could not find her mother's tank top and leaned over the bed to look for it. She said that the Defendant came over to the bed, bent her legs over her head in such a way that she was lying on her back at the edge of the bed, asked whether she was flexible, pulled down her pants, and put his mouth on her "private part." The victim stated that the Defendant used his fingers to separate her private part and that his fingers touched the inside of her private part. The victim later stated that his fingers "were kind of touching the inside, but like mostly on the outside."

*Pornography Incidents*

The victim testified that at the Scott Valley home, she and the Defendant watched a movie while her mother cooked in the kitchen. She said that the Defendant showed her a video recording on his cell phone in which a naked woman "had her hand on [a] guy's private part and was moving it up and down." After showing her the recording, the Defendant attempted to force the victim to touch his penis in the same way. The victim said she touched his penis briefly but pulled her hand away. She described the skin on the Defendant's penis as feeling "like a thin sheet of paper, like a tissue, but thinner."

The victim testified that on another occasion, the Defendant showed her a video recording with a naked, dark haired woman, but she could not remember anything else. The victim said that she had seen other recordings of people having sex or performing sexual acts on the Defendant's cell phone.

### Kitchen Incident

The victim testified that in the kitchen of the three-bedroom unit at Hickory Trace, the Defendant grabbed her waist, pulled down her gym shorts, and put his mouth on the outside of her "private part."

### Elissa Drive Incident

The victim testified that the summer before she began fifth grade, she and her mother moved out of the Scott Valley duplex and into a home on Elissa Drive because the victim's mother and the Defendant were arguing about his drinking. She said that the Defendant visited them at the Elissa Drive home and that the three of them watched *Night at the Museum*. The victim said her mother left to go to the store. The victim said that her back was to the Defendant and that she could feel him behind her moving the bottom half of his body. She stated that the Defendant's penis touched her buttocks through their clothes. She said that she moved to another couch to end the contact.

### Dog Shampoo Incident

The victim testified that she and her mother returned to the three-bedroom unit at Hickory Trace. She said that her mother asked her to get dog shampoo from a bathroom in the home, that she bent down to look for the shampoo under the bathroom sink, and that when she stood up, the Defendant grabbed her by the waist, "hugged" her from behind, and moved his penis against her buttocks. They were both wearing clothes. She said that it felt "weird, uncomfortable" but did not hurt and that she pulled away from the Defendant. She thought the Defendant told her to wait and said she saw the Defendant standing next to the toilet wiping his penis after she pulled away.

### Jennifer's Body Incident

The victim testified that another incident occurred at the Hickory Trace apartment after the victim's friend had spent the night at the apartment. After the victim's friend returned home, the victim played a game on her iPod. The victim said the Defendant told her that he could achieve a higher score at the game, and the Defendant began playing on her iPod. The victim said she started watching *Jennifer's Body* and remembered the Defendant's touching his penis. She said "he had his hand on his [penis] and he was moving his hand up and down." The victim said a slimy substance came out of the Defendant's penis and that he went to the kitchen and wiped his penis with a paper towel. The victim said she felt as

though the Defendant touched her but was unsure how he touched her and thought the Defendant may have touched her thighs.

The victim testified that during her forensic interview, she described the *Jennifer's Body* incident and that she discussed the Defendant's touching her but that she could not clearly remember the incident at the time of her testimony. The victim said that the Defendant touched her sexually more times than she could remember. She stated that the incidents to which she testified were incidents that "stood out" in her memory. The victim did not remember whether she described during the forensic interview incidents in which the Defendant touched the inside of her private part with his penis.

The victim testified that she told a friend that the Defendant was touching her but that, to the victim's knowledge, her friend never told an adult. The victim said that her friend encouraged her to tell the victim's mother but that the victim did not want the Defendant to go to jail. The victim said that her mother became pregnant and that the victim feared her mother might lose the baby if she told her mother about the abuse. The victim said that after the baby was born, she feared ruining the family. The victim said that she disclosed the abuse because she felt the touching was not going to stop. She noted that she was worried about her sister because the victim knew what it was like to be without a father and did not want her sister to have a similar experience. The victim said that this concern made her reluctant to testify.

The victim testified that she was unsure whether her mother would believe her if the victim reported the Defendant's abusing her. The victim said that she wrote a letter to her mother and left it by her mother's television in the Hickory Trace apartment but that the victim removed it before her mother read it.

The victim identified a journal in which she and the victim's friend had written and testified that she gave it to the police when they asked if she had any evidence of the Defendant's behavior. She identified a page from the journal that contained the letter the victim wrote to her mother, which read as follows:

> Dear Mom, If yhur reading this is becuz I gave it to yhu. It is really hardd to say this 2 yhur mom but: Scotty since May, ?, 2011 has been raping me. And it is really hardd 2 say this face to face so I put it in a note.

The victim explained that the Defendant's middle name was Scottie and that her mother called him by this name. The victim said that she sometimes called the Defendant Gotty. She said that she put a question mark after May because she was unsure of the date but

remembered the touching started at the end of fourth grade. The victim said that when she wrote raping, she meant touching by force on her private part and her buttocks by any part of the Defendant's body.

Another page from the journal showed a horizontal line dividing the page in half, with "2010 year" written on the top half and "2011 year" on the bottom half. The victim testified that the victim's friend wrote on the top half of the page and that the victim wrote on the bottom half. Under the "2011" heading, the victim wrote, "On June, meh & my mom moved to Elisa Dr.! He only did it once on the couch. My mom went to work. He wass in boxers, and he wass huging me a little too close!" The victim said that this paragraph was an attempt to document the Elissa Drive incident.

On cross-examination, the victim testified that she and her mother had a close relationship, that they spent time together, that her mother was the most important person in her life, and that her mother took care of her. The victim said that she could rely on and trust her mother and that her mother believed her when she told her things. The victim stated, however, relative to the Defendant's touching her that at the time she worried her mother would not believe her. The victim said that when she told her mother that the Defendant was touching her, her mother was concerned and angry. The victim stated that before she told her mother, she knew her mother would not allow the Defendant near the victim and would demand the Defendant leave the apartment.

The victim testified that she knew the Defendant would have to leave the apartment because her friend, J.P., had confided in the victim that J.P.'s stepfather had touched J.P. The victim and J.P. discussed their respective stepfathers' touching them. The victim said J.P. told her details of the touching that J.P. experienced, but the victim did not share details with J.P. of the Defendant's touching the victim. J.P. disclosed her stepfather's abuse to her mother in summer 2012, and J.P.'s stepfather moved out of the family home. The victim said that she learned the word "raping" from J.P. but that the victim learned the definition through Google.

The victim testified that her mother and the Defendant were excited for the victim's sister's birth in May 2012 and made preparations. The victim stated that her mother had "some trouble" late in the pregnancy and that after the birth, her mother did not have as much time to spend with the victim. She said that she was previously an only child and that the attention the new baby received made her angry and upset. The victim said that when she became angry, it was obvious to her family and that she and her mother discussed it. The victim stated that she and her mother discussed these changes before the baby was born and that her mother reassured the victim that her mother would not forget her. The victim stated,

however, that she was afraid of being forgotten, that she enjoyed the Defendant's calling her "the princess," and that she enjoyed being the center of attention. She said that she liked sitting between her mother and the Defendant at the movie theater and that she sometimes asked to attend her mother and the Defendant's dates.

The victim testified that her father moved to Virginia between the time she finished third grade and began fourth grade. She said that her father visited her in Tennessee and that she loved him. The victim stated that her parents' separation was a "sore subject" for her and that although she initially hoped for their reconciliation, her mother and father subsequently married other people.

The victim testified that she visited her father in Virginia when her sister was two weeks old. The victim said that her father spent most of the victim's visit working out of town, that her father's "new family" was not supportive of the victim, and that she was sad and anxious as a result. The victim said that she returned home early and told her mother about the Defendant's touching her shortly thereafter.

The victim testified that she wrote the letter to her mother after she and J.P. discussed the word rape and that she kept the letter for a long time. She said that when she returned from Virginia, J.P. told the victim that J.P. had disclosed J.P.'s stepfather's abuse to J.P.'s mother.

The victim testified that when she began having anxiety attacks, she was also worried about the new baby, school, and her friends. She identified a page from her journal in which she wrote "MF" and "sexy." The victim said she learned the word MF from the victim's friend and sexy from other students at school.

The victim testified that when she began fifth grade, the Defendant took a roofing job and was not home during the week. She said that she saw the Defendant on the weekends.

Relative to the *Lemonade Mouth* incident, the victim testified that her mother worked as a translator and was at work on the day of the incident. The victim said that when the Defendant initially attempted to pull down her pants, she felt uncomfortable. The victim said that when she was on top of the blankets, the Defendant also got out from under the blankets, and that when she returned under the blankets, the Defendant did the same. When asked why she did not get out of bed at that point, the victim stated that she had used the bottom sheet to make a cocoon around herself. She said that the Defendant pulled the sheets away from her when he got under the blankets the second time. The victim stated that she did not leave because there was distance between them. She said that the Defendant did not attempt to

move her legs or to manipulate her body. The victim did not know how many times the Defendant rubbed his penis between her legs and said she did not count the seconds and wanted it to end. The victim stated that the Defendant's penis went a "little bit" inside her and that this was the only time the Defendant had skin-to-skin contact with her. The victim said that when the Defendant got out of bed, he had pajama pants on and his penis was exposed through a flap in the front. She stated that when she went downstairs to use the restroom, she did not see any substances on her. The victim said that her mother came home three or four hours later, that the victim did not tell her mother what occurred, and that the victim did not show she was upset.

The victim testified that when she felt the Defendant's penis on her back, she pushed away but did not get out of bed because she feared he would hurt her. The victim said that the Defendant had never hurt her before or been violent with her but that she thought he would be angry if she tried to get away from him. The victim stated that the Defendant previously became angry with her but had "never . . . [done] anything." She said that generally, her mother disciplined her. The victim stated that the Defendant generally did not use the bathroom with the door open.

The victim testified that she thought she was between four and five feet tall in the fourth grade. She said that at the time of the trial, she was five feet tall.

Relative to the tank top incident, the victim testified that she told the Defendant, "stop, wait, no." She said that she did not call out for her mother, who was downstairs, because she did not want the Defendant to go to jail. The victim remembered that she ended the encounter but did not remember how. The victim said that she gave her mother the tank top and that although the victim was upset, she did not reveal it. The victim testified that other than this incident, the Defendant never put his hands on or inside her private parts or on top of her underwear.

Relative to the Elissa Drive incident, the victim testified that after her mother left the house, she did not leave the living room because she thought the Defendant "wouldn't do it." She said that the Defendant was wearing boxers but that she did not know whether his penis was exposed because he never touched her skin. The victim said that she pulled away from the Defendant after about one minute.

Relative to the dog shampoo incident, the victim testified that she did not know whether the Defendant's penis was exposed because she was facing away from him and because he did not touch her skin. She stated that she and the Defendant were standing and that the Defendant did not remove her pants. She said that when she picked up the dog

-10-

shampoo and turned around, she saw the Defendant wiping his penis. She did not remember what clothes he wore.

The victim testified that she was alone and had no assistance when she wrote the letter to her mother. She said that her handwriting was very similar to her friend's handwriting because they copied one another's writing style. The victim stated that the Defendant never threatened her or told her not to tell anyone about the incidents. The victim said the Defendant was never on top of her "face-to-face and naked." She said that to her knowledge, the Defendant had not been drinking when the incidents occurred. The victim said she was angered by the Defendant's drinking because it upset her mother.

Relative to the kitchen incident at Hickory Trace, the victim testified that she did not remember whether she told the forensic interviewer about it. She could not remember where her mother was during that time.

Relative to the pornography incident, the victim testified that the living room was arranged in such a way that she could not see into the kitchen. She said that the Defendant showed her the video recording while they sat on the sofa. The victim did not remember details or the length of the recording. She said she glanced at the recording and looked away. The victim said that she went into the kitchen with her mother and did not say anything to her mother about what had happened.

The victim testified that the Defendant left his cell phone around the house but that she did not play with his phone because her mother did not permit her to touch it. The victim stated that she had picked up the phone previously but had not examined it or played with it. The victim said that she did not remember when she viewed the other pornographic video recording or its contents.

On redirect examination, the victim testified that she had not seen J.P. in two years. She said she learned J.P. had told J.P.'s mother that J.P. was being abused while the victim was in Virginia with the victim's father. The victim said that she communicated with J.P. on Facebook and the victim's iPod. The victim stated that J.P. and J.P.'s mother moved to an apartment and that, to her knowledge, J.P.'s mother did not file a police report. The victim said that the victim's mother was unsuccessful in her attempt to contact J.P.'s mother to encourage filing a police report. The victim said that at the time of the trial, she was in contact with J.P. but that they did not talk or see each other often.

The victim testified that at school, she attempted to tell J.P. about the Defendant's touching her but that before the victim could, J.P. told the victim about J.P.'s stepfather's

abusing J.P. The victim stated that she told J.P. about the Defendant's abusing the victim. The victim said that J.P. did not tell her the details of J.P.'s stepfather's touching her. The victim did not know whether J.P.'s stepfather touched J.P. in the same manner in which the Defendant touched the victim. The victim stated that J.P. only told the victim to talk to the victim's mother, not what to tell the victim's mother. The victim stated that J.P.'s encouragement and the anxiety attacks influenced her decision to disclose the touching to her mother.

The victim testified that when she was in Virginia, she missed her mother and felt lonely. She said she sent text messages to and called her mother daily. The victim stated that she did not feel as though she was missing out on time with her two-week-old sister and that her sister got on her nerves. The victim said that when she returned from Virginia, she had an anxiety attack in the middle of the night, went to her mother's bedroom, and told her mother about the Defendant's touching her.

The victim testified that when she experienced an anxiety attack, she could not breathe; cried and shook; and had "irrational fears" of an intruder, being kidnapped, being robbed, or waking up alone in the house. She stated that the subject of her fears was not the Defendant. The victim said that when the Defendant moved out of her home, the attacks continued. She said that she had gained more control over them and that it had been a long time since she had an attack.

Regarding the *Lemonade Mouth* incident, the victim clarified that she never left the bed and that the Defendant followed her when she moved on top of and returned beneath the blankets. The victim testified that after the incidents, she felt angry and sad and blamed herself because she did not tell her mother and because she allowed the Defendant to touch her. She said that she felt sad and scared to testify but no longer blamed herself. The victim stated that she had hoped the Defendant would stop touching her and that she wanted a normal relationship with the Defendant because she had known the Defendant a long time and because he was a good father figure while her father was gone. She said that she did not want anyone to know what had happened and that if she had a choice, it would have remained a secret.

The victim's mother testified that the Defendant first saw the victim when the victim was eight or nine months old while the victim's mother and the victim were visiting family in California. The victim's mother said that the Defendant lived in a house with members of her family. She stated that she and the victim stayed in California for one month and returned to Guatemala.

The victim's mother testified that she next saw the Defendant in 2003. She said that she, the victim, and the victim's father went to California for a "couple months" to stay with the victim's mother's family. The victim's mother said that the Defendant was sixteen years old at the time and that the victim's mother was ten years older than the Defendant. After leaving California, the victim's mother said that she, the victim, and the victim's father moved to Nashville permanently.

The victim's mother testified that in 2008, she and the victim traveled to California for the victim's summer vacation. The victim's mother stated that she and the victim's father were separating and were having relationship problems. The victim's mother did not believe the victim was aware of the conflict. The victim's mother and the victim lived in California for one year in the house with members of her family, where the Defendant also lived.

The victim's mother testified that she and the Defendant reconnected as friends and that a romantic relationship developed in August 2008. The victim's mother stated that she and the Defendant began living together in November 2008 and moved to Tennessee in summer 2009. She said that the Defendant was attending school in California but lost his job and that he left school in order to move to Tennessee.

The victim's mother testified that when they moved to Tennessee, the victim lived with her father and that the victim's mother and the Defendant lived with a friend until October 2009, when the victim rejoined the victim's mother and the Defendant. The victim's mother said they moved to the Scott Valley duplex in October 2010. She said that the victim had her own bedroom and that the victim's mother and the Defendant shared another bedroom.

A school photograph of the victim dated 2010-11 was received into evidence. It portrayed the victim from the waist up, and the victim's mother affirmed that it accurately portrayed the victim's size and height at that time.

The victim's mother testified that the Defendant did not live with them between October 2010 and January 2011 for reasons connected to the Defendant's drinking alcohol. She said that the Defendant's drinking was a source of conflict during the course of their relationship. The victim's mother said that she did not want alcohol around the victim and that in January 2011, she permitted the Defendant to return to the duplex on the condition he stop drinking. The victim's mother stated that during that time, the Defendant did not drink and that she thought they were happy. She said that she worked for a translation office at a clinic and that the Defendant worked for a roofing company.

-13-

The victim's mother testified that she and the Defendant married on April 16, 2011, and that the Defendant resumed drinking in late May or early June. She said that she disliked his drinking but that he was never mean when he drank alcohol. The victim's mother said that as a result of the drinking, she and the victim left the duplex and moved to the Elissa Drive home in June 2011, where they stayed for three months. The victim's mother said that the Defendant visited them two or three times per week and stayed overnight. She stated that she left the victim alone with the Defendant once or twice per month when the victim's mother had to work on Saturdays because the victim wanted to sleep late and was bored at the victim's mother's workplace.

The victim's mother testified that she and the Defendant discussed his drinking, that the Defendant promised not to drink alcohol, and that she and the victim returned to the Scott Valley duplex. The victim's mother recalled a Saturday while living at Scott Valley when she left a note for the victim before going to work. The victim's mother said that she became pregnant after the reconciliation, that she and the Defendant were happy, and that the victim had mixed feelings about having a sibling. The victim's mother said that she and the victim discussed the changes when she was pregnant.

The victim's mother testified that they moved to the three-bedroom apartment at Hickory Trace when she was seven months pregnant in spring 2012. She said that the victim visited her father in Virginia for the first time and that the victim was excited. The victim's mother stated that the victim and the victim's father talked at least once per month on the telephone and saw one another annually. Before the trip to Virginia, the victim did not have anxiety attacks.

The victim's mother testified that the victim disclosed the abuse on a Thursday around 3:00 a.m. when the Defendant was working out of town. The victim's mother said she was breastfeeding her infant daughter when the victim entered her bedroom in the midst of an anxiety attack. The victim's mother said the victim was crying and told her, "Mommy Gotty rapes me." The victim's mother asked the victim what the victim meant when she said rape. The victim said the Defendant touched her buttocks, licked her private area, and put "his private in [her] private[.]"

The victim's mother testified that the victim had a previously scheduled therapy appointment the following day related to her anxiety attacks and that the victim's mother told the therapist what the victim disclosed. Based on her conversation with the therapist, the victim's mother filed a report with the police. She said that she received a telephone call from the Department of Children's Services (DCS) the day she filed the report asking if she

and the children were safe but that no one from DCS visited the apartment or interviewed the victim in spite of the victim's mother's calling and leaving messages.

The victim's mother testified that she and her daughters stayed with a cousin because she did not want the Defendant near her daughters. The victim's mother said that she returned to the Hickory Trace apartment around 9:00 or 10:00 p.m. because the Defendant needed access to the apartment but did not have a key. She said that she and the Defendant discussed the victim's accusations and that the Defendant denied any wrongdoing. The victim's mother stated that she spoke on the telephone with the Defendant during the week and told him not to come home on the weekend. She said she did not tell the Defendant she had been in contact with the police.

The victim's mother testified that she called the police the following Wednesday when DCS had not contacted her. She said Detective Michelle Hammond came to the home that evening and asked the victim's mother what the victim reported. Detective Hammond took a red, spiral-bound notebook from the victim but did not question the victim because of the victim's age. The victim's mother said that she and Detective Hammond reviewed the notebook together and that the victim said to her mother and Detective Hammond that she had written in the notebook what had happened. Before Detective Hammond's visit, the victim's mother remembered seeing a letter the victim had written in the notebook. Detective Hammond told the victim's mother not to inform the Defendant that the police were involved because the Defendant might flee the state. Although the victim's mother wanted the Defendant arrested immediately, she and Detective Hammond created a plan whereby the victim's mother would elicit a confession from the Defendant during a recorded telephone call. The victim's mother said that she wanted to hear from the Defendant what he had done. The victim's mother said that before the recorded telephone calls, the victim was interviewed twice and underwent a medical examination at Our Kids Center.

The victim's mother testified that she made two recorded telephone calls to the Defendant. The first was recorded three weeks after the victim's mother first spoke with Detective Hammond, and the second occurred one week later. The recordings were played for the jury.

In the first recording, the victim's mother asked the Defendant to tell the truth about his conduct. The Defendant stated "I already told you . . . I never raped her. I didn't do anything to her." The Defendant apologized and said, "I'm a hundred percent positively sure" that "it" was not going to happen again. When asked what "it" meant, the Defendant said, "Whatever you think happened." The Defendant said that "something" happened with the victim once a "couple of months ago" when the victim's mother was pregnant. When

asked why "something" happened with the victim, the Defendant responded "I don't know, I was not thinking better, just frustrated or something; I don't know." When asked whether he would touch the victim again, the Defendant stated, "No . . . I'm positive . . . I'm promising you. I'll take off, you know, like the next time, maybe I will, you kick me out and I will, will never talk to you again." The Defendant said that he wished "it didn't happen[.]"

The victim's mother testified that the first recorded telephone call referred to a prior telephone conversation from the previous day in which the Defendant made admissions regarding his behavior, but the victim's mother did not remember the substance of those admissions.

In the second recording, the victim's mother asked the Defendant how many times he had intercourse with the victim. The Defendant denied ever having intercourse with the victim. The Defendant admitted touching the victim once. He described an incident in which the victim wanted a "piggyback ride" and "groped" him. The Defendant said that a medical examination would show he did not have intercourse with the victim and that the victim was a virgin. The victim's mother said repeatedly that the Defendant needed to tell her the truth if he wanted to come home. The Defendant said that he "never put it in her" and that "you could call [the touching] a dry hump." When the victim's mother said that the victim's version of events differed and that the victim's mother would not allow the Defendant to return home if he did not tell the truth, the Defendant said, "Yeah, if she said . . . I had sex with her." When asked why the victim thought she and the Defendant had intercourse, the Defendant answered, "Because she probably thinks I did, but I, I rubbed it on her . . . . I'm thinking she's confused." When asked whether he used a condom, the Defendant replied that he did not need one because he did not "put it in her."

In the second recording, the Defendant said that in a previous conversation he was referring to touching, not intercourse, when he said that he wished "it" didn't happen and that if it happened again he would leave. The Defendant said the victim was lying when she said the Defendant put his penis inside her. The Defendant agreed to go to counseling. When the victim's mother pressed the Defendant about having had intercourse with the victim, the Defendant began crying, initially denied it, but admitted having intercourse with the victim once. The Defendant said that the intercourse occurred in the "new" apartment when the victim's mother was taking a shower and noted that the victim's mother was pregnant at the time. The Defendant said that he thought he was in the living room and that he wore a condom. The Defendant urged the victim's mother to have the victim examined because he thought the victim might be "hurt."

The victim's mother testified that she continued to have telephone contact with the Defendant between the time she confronted him about the abuse and the time of the recorded telephone calls because she did not want him to run away. The victim's mother said that she asked the Defendant during unrecorded calls whether he had intercourse with the victim and that he alternated between apologizing to her and saying he did not know to what the victim's mother was referring. The victim's mother denied the Defendant told her that the victim was "crazy for making these things up" or that he would go to the police if he were not permitted to return home and see his daughter. The victim's mother said that during the unrecorded telephone conversations, the Defendant accused the victim of lying and having psychological problems. The victim's mother said, though, that the Defendant would "again say that he did it." The victim's mother testified that after the second recorded telephone call, she asked the Defendant to meet at their apartment to talk. The police arrested the Defendant when he arrived.

The victim's mother identified a video recording of the Defendant's police interview and testified that at the end of the recording, the Defendant punched himself in the face and said in Spanish, "Oh, God, why did I talk?" The victim's mother said that she spoke to the Defendant when he was in jail, that he denied any wrongdoing, and that he said there was something wrong with the victim. She did not remember if the Defendant made any other admissions.

On cross-examination, the victim's mother testified that she was initially confused about the victim's allegations but ultimately believed the victim. She said that when she confronted the Defendant, the Defendant was shocked and confused and said, "I never did anything to her." When asked whether the victim's mother's belief in the victim's truthfulness caused her to disbelieve any explanation the Defendant gave, the victim's mother said, "He will never say yes . . . . Like you can ask somebody and they're going to say yes." The victim's mother stated that the Defendant was cooperative with her request that he stay away from the children and that he told her he would give her time to resolve the situation.

The victim's mother testified that she participated in the recorded telephone calls because Detective Hammond told her they needed additional evidence and that they could not yet arrest the Defendant. The victim's mother said that Detective Hammond discussed how to conduct a recorded telephone call and which information the victim's mother needed to elicit from the Defendant. When asked whether Detective Hammond told the victim's mother not to accept a denial from the Defendant, the victim's mother responded, "Not really, she just said we need to do this." The victim's mother said that after the first recorded telephone call, Detective Hammond told her they needed additional details and needed the Defendant to admit to intercourse with the victim. The victim's mother stated that she did

not intend to end the conversation until she elicited this information from the Defendant. The victim's mother said she told the Defendant that he could not return home unless he admitted touching or abusing the victim.

The victim's mother testified that she felt responsible for the victim and guilty when the victim disclosed the abuse. She stated that she would have done anything to know the truth, protect her daughters, and help the victim heal. The victim's mother said that she felt having the Defendant arrested was necessary to protect other young girls.

The victim's mother testified that having a child of his own was important to the Defendant and that he was excited about having a family. She said that she and the Defendant jointly decided upon the baby's name, that the Defendant was present at the birth, and that the Defendant took many photographs of the baby and adored her. The victim's mother said that she no longer knew whether family was important to the Defendant. She stated that the Defendant did not see his daughter from the time she was one month old until she was two months old.

The victim's mother testified that she and the victim's father separated when the victim was seven years old and that the victim seemed okay during their separation. When asked whether the victim hoped her parents would reconcile, the victim's mother responded that she and the victim did not discuss it.

The victim's mother testified that she and the victim had always shared a special bond, that she loved the victim, and that the victim was sensitive about their closeness and relationship. The victim's mother said that the victim needed attention but that the victim was a normal child in this regard. The victim's mother stated that the victim did not ask to attend the victim's mother's and the Defendant's dates, that the victim enjoyed spending time with both of them, and that the victim was not a needy child. The victim's mother said she thought that she knew what the victim was feeling and that the victim would tell the victim's mother how the victim was feeling. The victim's mother said that she attempted to talk openly about anything with the victim and encouraged the victim to share things with her.

The victim's mother testified that although a new baby brought changes to the family, the victim was happy and excited. The victim's mother said that she and the victim shopped for items for the baby and that the victim never cried or appeared upset about the baby's pending arrival. The victim's mother said that she and the victim discussed generally the time and attention a baby needed and that she told the victim not to feel bad when the baby arrived. The victim's mother stated that the victim was possibly jealous of the baby but was generally happy about having a sister.

-18-

The victim's mother testified that the victim's anxiety attacks started when the victim went to visit her father in Virginia and that the victim did not see the Defendant during that time. The victim's mother said that the victim's father had a new wife and three stepchildren and that the victim's father worked out of town from Monday until Thursday. The victim's mother stated that after two weeks, the victim called and asked the victim's mother to come get her. The victim's mother said that the victim communicated with her and some of the victim's friends while she was in Virginia.

The victim's mother testified that she had met J.P. and that she knew J.P. was one of the victim's friends. The victim's mother said that J.P. did not come to the victim's home and that the victim spent time with J.P. at school and twice at J.P.'s home. The victim's mother stated that after the victim disclosed the abuse, the victim's mother learned that J.P. made abuse allegations against J.P.'s stepfather and that the victim's mother was unsuccessful in her attempt to contact J.P.'s mother. She said that she was aware that J.P.'s stepfather no longer lived with J.P. and J.P.'s mother.

The victim's mother testified that she and the Defendant had a normal sexual relationship and that the victim would have been aware of it. She said that her and the Defendant's relationship had ups and downs but that she tried to make it work. The victim's mother acknowledged that the Defendant worked hard and took seriously his role as a provider. The victim's mother stated that the Defendant's drinking alcohol was the primary problem in their relationship, that she considered it unhealthy, and that when the Defendant drank alcohol, he drank to excess, although the Defendant was not always visibly drunk. The victim's mother said that although the couple did not argue in front of the victim, the victim was aware of the Defendant's drinking because the victim's mother discussed it with the victim.

The victim's mother testified that to her knowledge, the Defendant did not drink in connection with the abuse and was fully aware of what he was doing when he abused the victim. The victim's mother said that she told the Defendant an investigation was underway regarding the abuse and that he did not leave the state or the country to rejoin his family. The victim's mother said that she never thought that the Defendant might hurt the victim and that the Defendant and the victim had never acted upset or unusual toward one another. She said that she was shocked by the abuse.

On redirect examination, the victim's mother testified that in retrospect, she saw a pattern between the times the Defendant resumed drinking and a lapse in the abusive incidents and that she believed the Defendant drank to control his urge to touch the victim. The victim's mother clarified that although she called the Defendant once or twice per week

in the three-week period between the victim's mother's first conversation with the police and the Defendant's arrest, the Defendant called her about twenty-five times begging to come home. She denied calling the Defendant with the intent to make him confess and wanting to hear the Defendant admit he had abused the victim. The victim's mother said that she suggested counseling to the Defendant.

Caroline Patterson, an expert in evaluating child sexual abuse and a pediatric nurse practitioner at Our Kids Center, testified that on July 6, 2012, the victim was examined, that the victim was eleven years old, and that the victim was cooperative during the interview. She said that the victim reported last seeing her abuser three weeks before the examination. Ms. Patterson stated that the victim described penile/genital contact, digital/vaginal contact, oral/genital contact, and penile/buttock contact. Ms. Patterson said that the oral contact was between a tongue and the victim's "private part." The victim reported that the contact occurred between twenty-five and fifty times. The victim described having contact with a white, slimy substance coming out of her abuser's penis but said it never went inside her. When asked whether the victim wiped inside or outside her private area when using the restroom, the victim reported wiping both areas. Ms. Patterson said that children could perceive contact that causes pain and contact with the inside of the outer labia to be inside their genitals.

Ms. Patterson testified that the victim's physical examination was normal and that this was consistent with the reported incidents. She said that although the majority of children at Our Kids Center described penetration, injury was observed in six to seven percent of cases. She stated that an injury was uncommon and that no test existed to determine whether a female was a virgin. Ms. Patterson said that she would not have expected to find injuries on the victim because acute injuries would have healed within five days. Ms. Patterson agreed that the victim's description of the sexual contact was consistent with the results of her medical examination. She said that the victim's reported pain during urination was consistent with the penile/genital contact the victim described.

Ms. Patterson testified that, generally, a normal physical examination did not exclude the possibility of sexual abuse and that a normal examination only meant the patient was healthy. She said that the examination could not determine whether the contact occurred.

On cross-examination, Ms. Patterson testified that the medical examination did not indicate abuse. She was not aware of a ten-day gap between the victim's mother's contacting the police and the examination. Ms. Patterson noted, however, that if any injuries occurred more than five days before the victim's mother spoke with the police, the results of the examination would not have been affected. She said that the victim did not report pain in

connection with any of the incidents and that the examination was consistent with no sexual abuse. On redirect examination, Ms. Patterson clarified that the report did not reflect whether the victim was questioned about pain or reported having experienced pain.

Metro Nashville Police Detective Michelle Hammond testified that she received a call from another officer reporting a child rape and requesting her assistance. The officer and the victim's mother told Detective Hammond that the victim's mother had communicated with DCS on June 22, that DCS did not respond, and that the victim's mother had called again on June 27 when the Defendant was out of town.

Detective Hammond testified that she arrived at the victim's mother's home around 10:00 p.m. and that the reporting officer, the victim's mother, the victim, and the victim's friend were present. Detective Hammond said that the victim's mother was upset and that she provided a statement. Detective Hammond said she did not interview the victim because the victim was reluctant to leave her bedroom and appeared emotionally fragile. Detective Hammond referred the victim's mother to Our Kids Center and The Advocacy Center. Detective Hammond stated that she and the victim's mother created a plan for the investigation, which involved appointments at Our Kids Center, a forensic interview, and recorded telephone calls. Detective Hammond said that she considered the situation urgent because the Defendant had family ties to California, had dual citizenship with Guatemala, and traveled out of state for work. Detective Hammond identified the letter that the victim wrote to her mother and said it was given to Detective Hammond on June 27.

Detective Hammond testified that the two recorded telephone calls were conducted in a room at the Criminal Justice Center and in the victim's mother's apartment, respectively. Detective Hammond denied pressuring the victim's mother during the recorded phone calls. Detective Hammond said that she advised the victim's mother not to allow the Defendant to return to the apartment but "left it up to her how she wanted to handle her phone conversations with him . . . . it was a delicate balance that she maintained."

Detective Hammond testified that after she obtained the arrest warrant, the victim's mother arranged for the Defendant to return to the apartment and that police officers arrested him. Detective Hammond said Detective Jason Mayo interviewed the Defendant. Detective Hammond stated that Detective Mayo was present during one of the recorded telephone calls.

The video recording of the Defendant's police interview was played for the jury. In the recording, the Defendant denied raping the victim and said he told the victim's mother that he "would pay for the exam that they do cause they can—they can find it out . . . and that would be my proof . . . . [t]hat I didn't do it." The Defendant said that when the victim's

mother confronted him, he denied raping the victim. The Defendant stated that he lied to the victim's mother in their telephone conversations because he was "willing to say anything just to go home." The Defendant said he did not know why the victim would fabricate a story about him. When the Defendant continued talking about having the medical examination performed, Detective Mayo told the Defendant that the victim had been examined and that due to the results, "you're sitting [at the police station], my friend." Detective Mayo and the Defendant had the following exchange:

Q:      She's gonna heal up. She's gonna be fine, ok . . . . But you're sitting here.

A:      I know.

        . . .

Q:      . . . It's not like we're trying to put you away for the rest of your life, ok. We're not trying to do that.
        . . .

        Now, there's a possibility that you'll be able to see your daughter again—your other daughter. Not [the victim].

A:      But in years, five years.

Q:      Well, I—that's not up to me, ok.

A:      Five years. (crying) (inaudible)

When asked whether "it" happened once, the Defendant said, "No, it didn't. No it didn't . . . happen one time." When asked what happened, the Defendant said that on one occasion, he had an erection when sitting on the living room couch and that the victim "was being playful, she sits down over me, and I'm trying to hide it or what not[.]" The Defendant stated that the contact "maybe . . . could be considered as dry humping if—if it's hard and she's —she comes on me and she's like moving around[.]" He said that on another occasion, the victim saw him "naked coming out of the shower" and that he yelled at her to close the door. The Defendant described situations in which he had an erection and the victim jumped on the front of his body wanting a piggy back ride. He said, though, "I didn't dry hump her. I mean she might have . . . once, twice maybe, felt it underneath my pants[.]" The Defendant said that on one occasion at Scott Valley the victim "caught" him masturbating in a

bathroom. He stated that he was "right at that point" and that he did not stop for "two seconds" while he climaxed but restated that the victim "opened the door right when I was just finishing."

When Detective Mayo stated the Defendant was attempting to present the victim as a liar, the Defendant responded that the victim was not lying, that the victim had to be confused, and that he did not rape the victim. The Defendant said that he inserted two fingers "in her . . . over the panties" and that "in a sense I felt her up." The Defendant expressed concern that he would miss his child's first words and said that "I'm gonna be in jail because everyone's gonna think that I did it[.]" The Defendant said that "I had the option for working in town, and I didn't want to because I was mad at myself. I was afraid that it was going to lead to that. I was afraid that I was going to want to do that." When asked whether the Defendant rubbed his penis on the outside of the victim's vagina, the Defendant said that he did once. When Detective Mayo asked the Defendant to demonstrate using his hands where his penis went, the Defendant stated that the tip of his penis might have slipped inside what Detective Mayo described as her outer labia. The Defendant later clarified that he rubbed his penis between the clitoris and the vaginal opening. The Defendant said that the victim grabbed his penis once.

Detective Hammond testified that during the police interview, the Defendant did not deny touching the victim or explain why the victim might fabricate the allegations but rather repeated that the victim was not lying. Detective Hammond stated that she heard the Defendant say he was calmer after speaking to Detective Mayo and that the Defendant worked out of town to distance himself from the victim. She stated that the Defendant admitted he placed two of his fingers in the victim's genital area and rubbed his hands against the outside of the victim's vagina. Detective Hammond said the Defendant denied penetrating the victim and apologized for his conduct. Detective Hammond said that the Defendant focused on penetration.

Detective Hammond testified that she heard the victim's descriptions of the pornographic video recordings the Defendant showed her on his cell phone and that Detective Hammond found two recordings on the Defendant's cell phone that were consistent with the victim's descriptions. Detective Hammond said that she did not ask the victim to identify the recordings because Detective Hammond did not want to "re-victimize" the victim.

On cross-examination, Detective Hammond testified that during the Defendant's police interview, the Defendant commented he was hungry, requested water, and asked to speak with the victim's mother. Detective Hammond said that Detective Mayo could have

-23-

obtained food for the Defendant but made a strategic decision to deny the request. Detective Hammond acknowledged that the Defendant was not required to provide a reason the victim would lie.

Detective Hammond testified that Detective Mayo's statements about the medical examination showing physical evidence and about the victim's allegations were untrue. She said that Detective Mayo's questions were not necessarily based on the victim's allegations.

Detective Hammond testified that although the pornographic video recordings she found on the Defendant's cell phone generally matched the description given by the victim, without having shown the recordings to the victim, she could not confirm that the recordings were the same. She said that she never interviewed the victim or the Defendant.

The Defendant testified that he was age twenty-six and grew up in Van Nuys, California, where his parents, siblings, and uncle lived. He said that he was close with his family. He stated that he graduated from high school and had attended college. The Defendant said that he had known the victim's mother for about ten years and that they began a romantic relationship when he was age twenty-one. He said the couple moved to Tennessee for work.

The Defendant testified that when they moved to Tennessee, he had good relationships with the victim's mother and the victim and that they spent time together as a family. He said that the victim had her own bedroom in each apartment, that he was not often invited into the victim's bedroom, and that he did not spend time in her bedroom. The Defendant said that his relationship with the victim did not change and that the victim's mother never indicated to the Defendant that the victim had a problem with him.

The Defendant testified that the victim was indifferent when he and the victim's mother became engaged but that the victim was shocked when they married because the victim thought her parents would reconcile. He said that the victim's mother explained to the victim that the victim's mother was not going to reconcile with the victim's father.

The Defendant testified that he worked for a roofing company out of town during the week but rarely worked during the weekends. He said that he was the main financial provider for the family. The Defendant stated that he considered himself an alcoholic because he drank to excess on Fridays and when he was paid and that he experienced periods of sobriety. He said that he was incarcerated from late October 2010 to early January 2011 for a DUI conviction. The Defendant said that when he was intoxicated, he talked on the telephone to relatives and ignored the victim's mother.

The Defendant testified that he developed a feeling of purpose when his daughter was born and was happy to be a father. He said that the victim enjoyed being the only child and did not like the idea of having a sibling. The Defendant stated that the victim began carrying pacifiers and that he noticed the victim was jealous. The Defendant recalled the victim's becoming angry when he bought a pack of bibs, which contained a bib with the word princess written on it. He noted the victim's nickname was Princess. He said the victim always wanted to go on his and the victim's mother's dates.

The Defendant testified that when the victim visited her father in Virginia, the victim's mother talked to the victim every afternoon and evening and that the victim's mother told the Defendant about the victim's anxiety attacks. The Defendant said that he did not travel with the victim's mother to Virginia to pick up the victim. He said that the victim's nightmares during this time were about abandonment and that he thought it was normal because the baby had been born and the victim was in Virginia.

The Defendant testified that the weekend after July 4, 2012, he returned to Nashville around 2:30 p.m., that he had lost his house key, and that he waited for the victim's mother to return. He said that she returned around 9:30 p.m. and that they discussed the sexual abuse allegations. He stated that the conversation lasted about ten minutes, that the victim's mother told him she "had put a restriction order on me," and that she said he could stay in the apartment for the weekend but had to find other accommodations. The Defendant immediately told the victim's mother that he did not "do it" and requested the victim undergo a physical examination. He thought the victim's mother wanted to believe him but did not know what to do. The Defendant stated he had not done anything to the victim.

The Defendant testified that between the initial conversation and the first recorded telephone call with the victim's mother, he and the victim's mother spoke on the telephone three times. He said that the conversations dealt with whether the Defendant could come home, whether the physical examination had been performed, and the status of the victim's mother and the baby. He stated that he did not admit touching the victim during the unrecorded calls. When asked why he admitted touching the victim in the recorded phone calls, the Defendant said, "I was tired of getting the run around . . . I wanted to come home. I wanted to see my daughter. [The victim's mother] . . . did not want to hear the truth . . . she wanted to hear me say these allegations were true." The Defendant said that he decided to admit he touched the victim because the victim's mother told him he could not come home until he admitted it. He stated that he hoped after he was home, he could convince the victim's mother to have the victim examined. The Defendant said that his admissions in the second recorded phone call were untrue.

The Defendant testified that on the day he was arrested, he was supposed to meet the victim's mother because she told him he could return home. He said that they were going to discuss the situation and that he was going to ensure the victim underwent an examination. He said he cooperated with the arresting officers. The Defendant said that he thought he had been arrested for a probation violation connected to his DUI conviction until the officers told him the charge. The Defendant said that he was stunned and told the officers it was a mistake. The officers took the Defendant to a hospital to obtain a blood sample. The Defendant said that Detective Mayo arrived at the hospital, spoke with the doctor and the nurse, and asked the Defendant whether he wanted to talk.

The Defendant testified that he told Detective Mayo that he wanted to talk and went to Detective Mayo's office, a room with no windows that made him uncomfortable. He felt that he needed help and wanted Detective Mayo to believe him. The Defendant stated that although he initially denied the allegations and thought he could convince Detective Mayo he was innocent, he did not think Detective Mayo believed him. When Detective Mayo told him that "she would heal," the Defendant felt as if

> [T]he room was being filled with water and I had no way to escape. I thought, well . . . if he believes this, then I have to make him believe [in] something smaller, something that would take this charge away and lower it so that when I would go to jail, after stories you hear about people with these crimes being raped, killed, beat up, anything lower helped, gave me a chance to be here today.

The Defendant said that he knew about prison violence against sex offenders from his time in jail for the DUI conviction. He said that as soon as he heard the reason for his arrest, "it started to come down on me what could happen to me." The Defendant said that if someone had touched his daughter, he would want to kill the person and that as a result, he feared what "other people [would] think." The Defendant said that he thought child rape was disgusting but that when Detective Mayo told him physical evidence existed, he decided to admit to something else.

Regarding his admission that he inserted two fingers inside the victim over her underwear, the Defendant said

> First thing that came to my head of something lower than rape, simple touch here [and] there kind of thing would definitely be a lot lower than rape . . . it sounded really disturbing and . . . I guess saying over the panties made it easier

-26-

to say. . . . [and when] you're having sexual relationships with any girl, as you grow up, two fingers is what's used.

Regarding his second admission that he rubbed his penis on the victim's vagina, the Defendant said that Detective Mayo "kept persisting that I tell him something else . . . he wanted more." He said that Detective Mayo asked whether the Defendant had rubbed on the victim and that the Defendant agreed. The Defendant felt that he had to tell Detective Mayo what he wanted to hear and that Detective Mayo was not satisfied with his answers. When asked what the Defendant meant when he said he felt calmer after the interview, the Defendant said, "I felt calmer because I believe[d] that it had worked, that . . . [Detective Mayo] finally found a point where he was satisfied" and that the charges would be lowered. When asked why he told Detective Mayo that he worked out of town to curb his desire to touch the victim, the Defendant stated that he attempted to convince Detective Mayo it was impossible the Defendant had committed the offenses. The Defendant said that he was not thinking clearly and became angry with himself after the interview because he realized that his plan had been unsuccessful.

Regarding the *Lemonade Mouth* incident, the Defendant testified that on a typical Saturday, he slept until 12:30 or 1:00 p.m. and that the victim's mother was generally at home. He did not remember watching *Lemonade Mouth* or watching a movie in the victim's bedroom. The Defendant denied sexually assaulting the victim on this occasion and did not know why she would lie. The Defendant admitted having pornography on his cell phone but denied showing it to the victim. The Defendant said the victim was not allowed to look at his phone because it contained pornography and recordings of intercourse between the Defendant and the victim's mother. The Defendant testified that his and the victim's mother's sexual relationship was "[a]wesome," that they continued having intercourse throughout her pregnancy, and that the victim's mother went into labor immediately after intercourse.

The Defendant testified that he did not think he had seen *Night at the Museum* in its entirety and denied that he watched it with the victim and the victim's mother. He said that wearing boxer shorts instead of pants around an eleven-year-old girl was "inappropriate" and that he would not have been in boxer shorts unless he was dressing after showering. The Defendant denied the dog shampoo incident occurred and said the shampoo supplies in question were located in a different bathroom than the one described by the victim. The Defendant denied touching, "humping," or exposing himself to the victim.

On cross-examination, the Defendant testified that he admitted touching the victim on three occasions. The Defendant said he told the victim's mother in the first recorded

telephone call that he had done "it," told her that he inserted his penis inside the victim during the second recorded phone call, and told Detective Mayo that he inserted the tip of his penis inside the victim's genital area and that the victim grabbed his penis. The Defendant agreed that the victim's description of the skin on the Defendant's penis was vivid and that this type of information was not something the victim would have known without having had experience with it. The Defendant denied the victim had touched his penis. The Defendant said that he was lying when he said he had inserted two fingers inside the victim's genital area. He stated that he believed a medical examination could prove whether the victim had been penetrated. The Defendant could not remember whether he denied having touched the victim in his police interview. He said he told Detective Mayo that he did not penetrate the victim but later told Detective Mayo that he "let the tip slip in" in spite of knowing he faced jail time.

The Defendant acknowledged that the victim said the abuse resumed in January 2011 after he arrived home from jail and that he was not drinking during this time. He said he began drinking in June 2011, the victim's mother and the victim moved out of the family home, and he stopped drinking in order to reconcile with the victim's mother.

The Defendant testified that the victim had possible motives for lying, including the prospect of removing the Defendant from the home and being upset about having a younger sister, because "[t]hat could indicate more attention towards her, could indicate [her] father can come back into the picture[.]" He acknowledged he told Detective Mayo that the victim stopped believing her parents would reconcile when she was nine years old. He said that the victim thought her parents would reconcile until the Defendant and the victim's mother married. The Defendant did not know how his being removed from the home was beneficial to the victim or enabled her to receive more attention because he was already working out of town during the week.

The Defendant testified that it was possible the victim was lying when she said she did not report the abuse out of fear her mother would lose the baby. The Defendant said that the victim's reaction to the new baby and her need for reassurances were normal. He said that the victim's mother's reaction and actions after hearing the allegations were appropriate and that he would have done the same. He said that the victim's mother treated him fairly except for not having the victim undergo the physical examination. The Defendant said that he learned about the allegations on July 6. Regarding the discrepancy between this timeline and the victim's mother's timeline, he said that either of them could have been confused. The Defendant testified that under his timeline, one weekend passed between the victim's mother's confronting him about the allegations and his arrest. He said, however, that he remembered not having seen his daughter for three weekends at the time he was arrested.

The Defendant stated that he could have called the victim's mother twenty-five times during that period but that he did not remember.

When asked whether he knew that the police did not find any recordings of intercourse between the Defendant and the victim's mother on the Defendant's cell phone, the Defendant testified that the victim's mother could have deleted them. The Defendant said that it was possible the victim found the pornography on his cell phone and used the contents to fabricate the allegations against him but that he and the victim's mother never witnessed the victim watching pornography on his phone.

The Defendant did not recall admitting touching the victim in a telephone conversation before the first recorded telephone call. The Defendant said that when he commented during the recorded phone call, "If I ever do it again, I'll leave," he was referring to the alleged rape but that he did not rape the victim. The Defendant stated that he was desperate to go home and that when he admitted penetrating the victim with the tip of his penis, he "[f]igured [the victim's mother] wanted to know the truth, that with enough from me . . . [she would think] I'll give him a chance, he can come home and we'll go check this out together."

The Defendant testified that Detective Mayo never used the word injury when discussing the victim's medical examination but that the detective's saying the victim would heal implied she was injured. He admitted that Detective Mayo never said proof existed showing that the Defendant had raped the victim but that Detective Mayo implied that evidence existed. The Defendant stated that he lied to the police about the victim's seeing him masturbate and said that he fabricated the story after being bullied by Detective Mayo. The Defendant acknowledged that he could have stopped the questioning at any time.

The Defendant testified that he did not call DCS or the police when the victim's mother prevented him from seeing his daughter because he trusted the victim's mother would handle the situation. He said that at the time of the police interview, he did not believe the victim was lying and thought that she was confused because of her panic attacks and nightmares. He felt his theory was reasonable after learning of J.P.'s conversations with the victim.

The Defendant testified that he did not have a choice to work out of town and that he would have preferred to work closer to home during the victim's mother's pregnancy and after his daughter was born. The Defendant agreed that the purpose of telling Detective Mayo he had a choice of where he worked was to convince Detective Mayo he was innocent because he left town to prevent anything from occurring. The Defendant said that he asked

Detective Mayo to apologize to the victim for him because it was the next logical step in making Detective Mayo believe he had not raped the victim. The Defendant stated that at the end of the interview, he thought he had convinced Detective Mayo and that when he punched himself in the face, he felt stupid.

On redirect examination, the Defendant testified that Detective Mayo's telling him the victim would heal was an attempt to tell the Defendant that something was wrong with the victim and that she had been molested. He said that when Detective Mayo told him physical evidence of abuse existed, "that's when I had to change, I had to in a sense save myself." The Defendant stated that he told the victim's mother that the victim was lying, that he told Detective Mayo the victim was not lying, and that he could give no reason for the discrepancy.

Upon this evidence, the Defendant was convicted of attempted aggravated sexual battery in Count 1, aggravated sexual battery in Counts 6, 8, 9, and 10, and rape of a child in Counts 3, 4, 5, and 7.[2] After a hearing, the trial court sentenced the Defendant as a Range I, standard offender to four years for Count 1, attempted aggravated sexual battery; forty years each for Counts 3, 4, 5, and 7, rape of a child, to run concurrently with Count 1; and twelve years each for Counts 6, 8, 9, and 10, aggravated sexual battery, to run concurrently with Count 1. The total effective sentence was forty years. At the motion for a new trial, the court dismissed the conviction for rape of a child corresponding to Count 7, determining that the conviction was based solely on the Defendant's uncorroborated testimony. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to establish penetration relative to Counts 3 and 4 for rape of a child, which respectively correspond to the penile/genital contact during the *Lemonade Mouth* incident and the digital/genital contact during the tank top incident. The State responds that the evidence was sufficient to establish penetration.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[2] Count 2 was withdrawn from the jury's consideration.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2014). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" T.C.A. § 39-13-501(7) (2014). Our supreme court has held that

> [t]here is . . . 'sexual penetration' in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.

*State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

Regarding Count 3, the *Lemonade Mouth* incident, the victim testified that the Defendant put his penis between her legs from behind and moved it back and forth. Although the victim stated on direct examination that the Defendant's penis touched a "little bit on my private part" and denied contact with the inside of her private part, she testified on cross-examination and redirect examination that the Defendant's penis touched "a little bit" inside her private part. The victim experienced burning upon urination after the incident. The victim later testified that she did not remember an occasion during which the Defendant's penis went inside her private part. Ms. Patterson testified that children often

describe contact with the labia as having been "inside" their private parts and that pain during urination was consistent with the contact the victim described.

We conclude that a jury could have found beyond a reasonable doubt the Defendant's penis penetrated the victim's labia. Although the victim's testimony regarding the contact varied, conflicts in the testimony were resolved by the jury, and its verdict reflects that it credited the victim's testimony that the Defendant penetrated the victim. We will not reevaluate the evidence on appeal.

Regarding Count 4, the tank top incident, the victim testified that the Defendant used his fingers to separate her private part and that his fingers touched the inside of her private part. The victim stated that his fingers "were kind of touching the inside, but like mostly on the outside." We conclude that the jury could have found beyond a reasonable doubt that the Defendant's fingers penetrated the victim's labia, which is sufficient to establish sexual penetration of the victim. The Defendant is not entitled to relief on this basis.

## II

### Due Process

The Defendant contends that his convictions for attempted aggravated sexual battery in Count 1 and rape of a child in Count 3 in connection with the *Lemonade Mouth* incident violate due process because the convictions resulted from one continuous criminal episode and involved one criminal intent. The Defendant makes the same argument regarding his two convictions for rape of a child in Counts 4 and 5 in connection with the tank top incident. The Defendant requests merger of Counts 1 and 3, reflecting one conviction for rape of a child, and merger of Counts 4 and 5, reflecting one conviction for rape of a child. The State responds that each conviction stemmed from a distinct type of sexual contact and that the dual convictions do not violate due process principles.

The Defendant requests this court apply the due process analysis stated in *State v. Barney*, 986 S.W.2d 545, 548 (Tenn. 1999). The State argues the analysis in *Barney* is no longer viable because our supreme court relied upon now-abrogated cases in creating the *Barney* analysis. However, the State offers no alternative analysis. A review of the relevant case law is instructive.

In *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991), our supreme court concluded that separate convictions for kidnapping and an underlying felony violate due process when the confinement or removal is "essentially incidental" to the commission of the underlying

felony and is not "significant enough" to support a separate kidnapping prosecution. In *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), also in the context of kidnapping, the supreme court replaced the essentially incidental test with a two-part due process analysis which examined whether the confinement went beyond that necessary to perpetrate the underlying felony and whether the kidnapping "(1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." (citing *Anthony*, 817 S.W.2d at 306); *see State v. Richardson*, 251 S.W.3d 438, 443 (Tenn. 2008) ("The *Dixon* two-part test fully replaces the *Anthony* 'essentially incidental' analysis."). In *State v. Denton*, 938 S.W.2d 373, 381 (Tenn. 1996), also in a kidnapping context, the supreme court developed a four-part analysis pursuant to double jeopardy principles.

While *Anthony*, *Denton*, and *Dixon* remained the leading authority in kidnapping cases, our supreme court examined whether dual convictions for two sexual offenses violated principles of due process. In *State v. Barney*, our supreme court acknowledged that *Anthony* and its progeny could apply in cases not involving kidnapping but that the essentially incidental test was unhelpful in the context of sexual offenses "because each separate sexual act 'is capable of producing its own attendant fear, humiliation, pain, and damage to the victim.'" 986 S.W.2d at 548 (quoting *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn.1996)). Instead, our supreme court rejected *Anthony* and its progeny and relied upon *People v. Madera*, 282 Cal. Rptr. 674 (1991), in developing a more helpful analysis in the context of dual convictions for sexual offenses. In *Madera*, the California Court of Appeal concluded that multiple convictions for an "undefined lewd act" and oral copulation were not precluded by a statute intended to prevent multiple punishments for the same conduct. *Id*. at 680. The court reasoned,

> The distinction for punishment purposes between undefined acts designed generally to arouse and those intended directly to facilitate defined sex acts recognizes the relatively greater culpability of the defendant who commits the former. The reason for the distinction is readily evident. The undefined act is a separate insult to the body—and the spirit—of [a victim].

*Id*.

Utilizing this distinction, our supreme court created a five-factor analysis to aid in distinguishing "preparatory" sexual conduct intended to arouse the victim or perpetrator before an additional sexual act from contact "directly facilitative or . . . merely incidental" to the underlying sexual act. *Barney*, 986 S.W.2d at 548. Pursuant to *Barney*, multiple

convictions for preparatory acts were permissible, but multiple convictions for facilitative or incidental acts were not permissible. *Id.* The five factors were:

1.  temporal proximity—the greater the interval between the acts, the more likely the acts are separate;

2.  spatial proximity—movement or re-positioning tends to suggest separate acts;

3.  occurrence of an intervening event—an interruption tends to suggest separate acts;

4.  sequence of the acts—serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and

5.  the defendant's intent as evidenced by conduct and statements.

*Id.* at 548-49.

In *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012), our supreme court abrogated *Anthony* and its progeny's due process analysis in kidnapping cases. The court concluded that the issue of whether a kidnapping was incidental to an underlying felony was a question of fact for the jury. Relative to appellate review, the court concluded that "assessing the sufficiency of the conviction evidence qualifies as the ultimate component" of due process safeguards, and that "[t]he separate due process test articulated [in *Anthony* and its progeny] is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." *Id*. The court clarified that "*Anthony* and the entire line of cases including a separate due process analysis in appellate review are expressly overruled." *Id*.

The *Barney* court examined *Anthony* and its progeny and rejected their reasoning outside of a kidnapping context, specifically noting that *Anthony*'s approach was unhelpful in the context of sexual offenses, and instead used *Madera* to develop the five-factor test. *White* overruled *Anthony* and the use of a separate due process analysis, but we note that *White* was also decided in the context of kidnapping. Absent further guidance from our supreme court, we cannot conclude that *White* abrogated *Barney*. Therefore, we analyze the present case pursuant to *Barney*.

## Counts 1 and 3

The record reflects that the conviction associated with Count 1, attempted aggravated sexual battery, stemmed from the contact between the Defendant's penis and the victim's buttocks during the *Lemonade Mouth* incident. Relative to Count 1, the election of offenses filed by the State referred to "the following conduct: the defendant rubbed his penis against the victim's butt . . . The defendant pulled the victim's pants down and began moving his penis back and forth against the victim's buttocks. The victim testified that she felt something watery on her private part[.]"

Count 3 of the indictment, rape of a child, stemmed from the same incident in which the Defendant's penis penetrated the victim's labia. The election of offenses for Count 3 referred to "[t]he following conduct: the defendant penetrated the genital area with his penis . . . . The defendant pulled the victim's pants down and began moving his penis back and forth against the victim's genital area between her legs[.]"

Applying the *Barney* factors, the two types of contact were in immediate temporal and spatial proximity to one another without intervening events or repositioning of the Defendant or the victim. The contact involved two parts of the victim's body, her buttocks and her labia, but only her labia were penetrated. There was no testimony as to the Defendant's intent. We conclude that the contact with the victim's buttocks was merely incidental to the penetration of the victim's labia, and as a result Counts 1 and 3 should merge. *See Barney*, 986 S.W.2d at 548 (citing *Madera*, 282 Cal.Rptr. at 680) (holding that if a sexual act "directly facilitates or is merely incidental to the accompanying sexual conduct . . . convictions for both acts would be barred."). Because the touching of the buttocks was incidental accomplishing the rape, we remand for modification of the judgments for Counts 1 and 3 to reflect the merger of Count 1 with Count 3.

## Counts 4 and 5

The record reflects that both convictions for rape of a child in Counts 4 and 5 related to digital and oral penetration during the tank top incident. The victim testified that the Defendant bent her legs over her head, pulled down her pants, separated her labia with his fingers and touched her on the inside "a little bit," and put his mouth on the inside of her private part.

Applying the *Barney* factors, the victim's testimony reflects that two types of contact occurred within a short time period. The Defendant had to reposition his body in order to complete both types of penetration. There was serial penetration of the same orifice, but the

penetration was accomplished by the Defendant's using two distinct body parts. Again, no evidence was presented relative to the Defendant's intent. We conclude that the digital penetration was not incidental to the oral penetration. Digital penetration was not necessary to complete oral penetration, and as the *Madera* court observed, the distinct method of penetration was a "separate insult" to the victim. *See* 282 Cal. Rptr. at 680. The dual convictions do not violate due process principles, and the Defendant is not entitled to relief on this basis.

## III

### Evidence of the Defendant's Excessive Drinking

The Defendant contends that the trial court erred in allowing the State to present evidence regarding the Defendant's excessive drinking during its case-in-chief. He argues that the evidence was inadmissible because it was irrelevant, was a prior bad act that did not fall under the "contextual background evidence" exception to Tennessee Rule of Evidence 404(b), and was unduly prejudicial under Tennessee Rule of Evidence 403. The State contends that the evidence was relevant and necessary to complete the State's narrative at the trial.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). If a trial court complies with four procedural requirements, this court reviews the decision for an abuse of discretion; otherwise, we review the decision de novo. *See* Tenn. R. Evid. 404(b)(1)-(4); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see also State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

During a pretrial hearing regarding the admissibility of evidence of the Defendant's excessive drinking, trial counsel argued the evidence was an inadmissible prior bad act and was unnecessary to complete the State's narrative. Counsel conceded, however, that she intended to focus on the victim's delayed disclosure of the abuse at the trial. Counsel argued a prejudicial "link between alcohol and sexuality" existed, which could influence the jury. The State responded that it did not intend to present the Defendant's drinking as a cause of the abuse but that the drinking was relevant to the family atmosphere, the reason the victim's mother moved to the home on Elissa Drive, and "how . . . the atmosphere in the home affected [the victim's] decision to disclose."

The trial court determined that the evidence regarding the Defendant's drinking was admissible and not "that big of an issue." The court reasoned that "[j]uries like to know why we have relationship problems " and that without the reason the victim's mother separated from the Defendant for three months, the jury could speculate that the victim's mother knew about the sexual abuse but did not want to involve the police because she loved the Defendant and that the victim's mother covered up the abuse. The court also determined that not allowing testimony relative to the Defendant's drinking could mislead the jury. The judge noted that a curative instruction regarding the limited purpose for which evidence of the drinking was offered was less difficult than instructing the jury about drawing conclusions based upon missing information. We note that the court did not instruct the jury relative to the limited purpose of the evidence and neither of the parties requested such an instruction. The court found that for purposes of cross-examination, the Defendant's drinking related to his credibility because of the effect alcohol had on memory. The court cautioned counsel not to "open the door" on the drinking issue and agreed with counsel that the prosecutor should not "belabor" the Defendant's drinking.

We conclude that under the facts of this case, the issue of the Defendant's drinking does not lie in the purview of Rule 404(b). Alcohol consumption, standing alone, is neither illegal nor stigmatized in the community such that its inclusion in trial testimony would prejudice the Defendant. *Cf. State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014) (holding that evidence of the Defendant's pornography use was improper and prejudicial in a rape of a

child case). The State made clear, and trial counsel acknowledged, that evidence of the Defendant's drinking was not presented for the purpose of showing criminal behavior in conformity with the character trait. Instead, the State used the fact of the Defendant's drinking to establish the household's atmosphere, the circumstances affecting the victim's decision to disclose, and the victim's mother's decision to move to Elissa Drive. Because the Defendant's drinking is not, in context, a bad act, its admissibility is governed by Rules 401 and 403 relative to relevance. We therefore review the trial court's decision for an abuse of discretion.

We conclude that the testimony regarding the Defendant's drinking had some probative value to provide context and explain why the victim decided not to disclose the abuse and why the victim's mother left the marital home. The evidence also prevented the jury from drawing harmful conclusions about the Defendant, the victim, or the victim's mother that it might have drawn in the absence of the evidence. The prejudicial effect that the jury might conclude drinking to excess generally leads to child sexual abuse was diminished because the evidence was offered to explain the delay in reporting and the victim's move to another residence. The evidence was not presented as a cause of the abuse. We conclude that the trial court did not abuse its discretion by determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

## IV

### The Victim's Letter

The Defendant contends that the victim's letter to her mother was inadmissible hearsay. The State concedes that the letter was inadmissible hearsay but argues that the error was harmless. We agree with the State.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)). A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

-38-

The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

At a pretrial hearing, the Defendant argued that the letter was not a first disclosure and was inadmissible hearsay. The State responded that the letter was proof that the victim wished to disclose the abuse before telling her mother and, as a result, helped to explain why the victim did not disclose the abuse sooner. The State added that the letter was written when the victim had no motive to lie and could serve as a prior consistent statement after impeachment of the victim by the Defendant. The trial court denied the Defendant's motion without explanation.

The record reflects that letter was an out-of-court statement by the victim offered to prove that the victim's sexual allegations were truthful. As such, the letter was hearsay and should have been excluded. The Defendant objects to the victim's testimony regarding the contents of the letter as well as the admission into evidence of the letter itself. The victim, the victim's mother, and Detective Hammond testified about the existence of the letter. The victim read the letter into evidence and was cross-examined about its contents before the trial court received it as an exhibit. We cannot conclude that evidence of the letter and its contents had any impact on the jury's verdict. Furthermore, the victim's detailed testimony regarding the abuse and the Defendant's admissions provided ample basis for the convictions. We conclude that the admission of the letter, while erroneous, was harmless. *See* T.R.A.P. 36(b). The Defendant is not entitled to relief on this basis.

V

**The Defendant's Statements to the Police**

The Defendant contends that the trial court erred in denying his request to redact his statement during his police interview about going to jail for five years because it was irrelevant and misled the jury by minimizing the jail sentence the Defendant faced. The State responds that the statement was relevant to guilt and did not affect the jury's verdict. We agree with the State.

The statement at issue occurred midway through the Defendant's police interview. The Defendant began crying at the prospect of going to jail and not seeing his newborn daughter for "years . . . five years." In his pretrial motion, the Defendant argued that his reference to going to jail for five years would mislead the jurors and give the jurors the impression that a child sexual abuse conviction would only result in a five-year sentence. The prosecutor responded that the statement in context demonstrated the Defendant knew he

-39-

faced imprisonment and yet admitted he abused the victim. The prosecutor noted that the jury would be instructed to disregard any potential sentence the charges carried. The court denied the Defendant's motion and noted that the statement was "almost an acknowledgment of guilt."

The trial court did not abuse its discretion by denying the Defendant's request to redact the statement, which was relevant to assessing the Defendant's credibility. The probative value of the evidence was not significantly outweighed by the risk of unfair prejudice. Although the Defendant argues that the jury was misled into thinking the Defendant faced a short sentence, the jury was instructed by the trial court that sentencing was a separate matter from the verdict. Further, the jury had ample grounds on which to base its verdict, including the detailed descriptions of abuse provided by the Defendant during the remainder of the police interview. The Defendant is not entitled to relief on this basis.

## VI

## Victim's School Photograph

The Defendant contends that the trial court's decision to allow a school photograph of the victim labeled "2010/11" was an abuse of discretion. He argues that the photograph was irrelevant and that the probative value was substantially outweighed by the risk of unfair prejudice because the photograph made the victim appear more sympathetic. The State responds that the trial court did not abuse its discretion, that the photograph was relevant, and that the Defendant was not prejudiced by its admission. We agree with the State.

The record reflects that before the photograph was introduced during the victim's mother's testimony, the victim was cross-examined as to her height at the time of the abuse. The victim testified that she was between four and five feet tall at the time of the abuse and was five feet at the time of the trial. During a bench conference, the Defendant objected to the photograph and said the victim's appearance was "substantially the same" in the photograph as at the trial. The State responded that during the Defendant's cross-examination of the victim there was discussion of the victim's height and her size and an implication that the victim should have walked away or "been able to get away" from the Defendant, and that this was a method of impeaching the victim's credibility as to the truth of her allegations. The trial court allowed the photograph.

We conclude that the photograph was relevant to the victim's testimony regarding her size, as raised by the Defendant's questions on cross-examination. *See State v. Herbert Lee Wilson*, 1988 WL 122486 (Tenn. Crim. App. Nov. 16, 1988) (holding that the introduction of

a school photograph of the victim at the time of the offense was relevant to show the victim's size at the time of the offense). Regarding potential prejudice, the Defendant argues that the juxtaposition of a school photograph depicting a happy child and the victim's testimony of sexual abuse unfairly played to the sympathy of the jury. The Defendant placed the victim's size and height at issue in an attempt to impeach her credibility, and the photograph did not expose the Defendant to unfair prejudice.

## VII

## Sentencing

The Defendant contends he was erroneously sentenced under the January 1, 2012 version of Tennessee Code Annotated section 39-13-522 relative to his rape of a child convictions in Counts 3, 4, and 5, arguing that the State did not present specific proof of incidents occurring on or after January 1, 2012. The State agrees. The Defendant does not challenge the sentences for the remaining convictions. The Defendant requests a modification of his sentence to twenty-five years for each rape of a child conviction, and the State requests the case be remanded for a new sentencing hearing.

At the sentencing hearing, the victim's mother testified that since she learned the Defendant had sexually abused the victim, "It was pretty hard. I was with a six[-week-old] baby by myself without a job knowing that the person that I loved did something to my daughter." She said that the victim had panic attacks at home and at school, did not sleep at night, refused to ride in a car, and was "afraid of everything." The victim's mother said that the victim was afraid the Defendant would "get out of jail and do something to me or her." She said that the victim was concerned about the victim's mother's sadness and the victim's sister's lack of a father. The victim's mother said that she struggled with her finances, having somebody to talk to, and trying to understand the victim.

The victim's mother testified that she and the victim attended therapy separately. She said that therapy helped the victim control her panic attacks. The victim's mother said that when the victim had an attack,

> [s]he gets really afraid, like she can't breathe and she starts panicking, that she's going to throw up and . . . she [doesn't] know what to do to stop it, and she knows she has the coping skills, but sometimes . . . it doesn't work . . . she's crying, I'm crying[.]

The victim's mother said that when the victim had a panic attack outside the victim's mother's presence, the victim's mother had to pick up the victim from school or come home immediately. She said that the victim was unable to stay overnight with friends due to the attacks. The victim's mother said it was difficult to witness her daughter's emotional state because she could not help the victim and because what the Defendant did could not be fixed.

The victim's mother testified that the Defendant mailed her letters from jail and telephoned her. She said that she did not accept the calls and that she read the letters hoping to receive an apology, but that the Defendant never expressed remorse. The victim's mother asked the court to order the Defendant to stop contacting her and her family.

The victim's mother read a letter written by the victim to the court:

Dear Your Honor, I want to tell the Court about how my stepdad abused me and how it affected me. I would like to start off by saying that what he did to me affected everyone . . . it made me have panic attacks, made my mom sad and left [the victim's sister] fatherless. I lost all respect for him. I love someone close to me, but at the same time he is a butt-head. After every time he touched me, I felt mad and angry and just wanted to leave the house. When I told, I was afraid that no one would believe me, but . . . what I would like to happen [is] that he can be in jail until me and [the victim's sister] are adults because then he won't be able to hurt me and [the victim's sister] and that's what I have to say, thank you.

The victim's mother said that she was thankful she and the victim were believed and that "I would like for [the Defendant] to stay in jail for a long time." She said that the idea of the Defendant's release from jail scared her because "nobody will look at him and think he's a bad person."

On cross-examination, the victim's mother testified that the victim's panic attacks varied in frequency from once a month to three times a week. She said that the victim's last attack occurred one month before the hearing. The victim's mother agreed the judicial process was a stressor that contributed to the attacks and said she hoped the attacks would become less frequent after the sentencing hearing.

The victim's mother testified that the victim no longer had the nightmares she had before the Defendant's arrest. The victim's mother said the victim could not identify what triggered her panic attacks, only that she was afraid. The victim's mother denied that

-42-

separation anxiety was the cause of the attacks, said that the victim was "just afraid," and stated that the attacks were connected to the abuse.

The victim's mother testified that her therapist said the Defendant had a "pathological sickness," which was not "changeable" or "fixable." The victim's mother said that she had known the Defendant since the Defendant was age six and that she never had reason to believe the Defendant was a pedophile. The victim's mother stated that her fear of the Defendant's being around other young girls was based on her discussions with her therapist. She said that she wanted the Defendant to receive the maximum sentence.

The victim's mother testified that had the Defendant not committed these offenses, her younger daughter would still have a father and that the victim would not blame herself. The victim's mother stated that the Defendant's letters were romantic in nature and referenced the Bible. The victim's mother said that she responded to one or two letters in which she expressed her displeasure at having received them and told the Defendant not to contact her. She stated that she was angry at the Defendant.

The victim's mother testified that the Defendant provided financial support for the family, which was important to him. She denied having received money from the Defendant's mother after the Defendant went to jail but said that the Defendant's mother gave her homemade baby clothes and blankets when her younger daughter was eight months old. The victim's mother did not know whether the Defendant was concerned about the welfare of his daughter, although he said he loved his daughter in his letters.

On redirect examination, the victim's mother testified,

[The victim is] a really strong girl, but it's not fair for an adult to do something to a girl and it's not fair for my other daughter to go without a father . . . because he's the way he is and he [took] advantage of me and [the victim], and seeing [the victim] cry and being afraid . . . It is something to think about and to know that he is not even man enough to accept what he did and [the victim] having to go to therapy and me having to go to therapy because I cannot trust people . . . I cannot get right because it's not fair.

The victim's mother said that if the Defendant loved her and her two daughters, he would not have committed the offenses. Upon examination by the trial court, the victim's mother testified that she and the victim went to therapy weekly but that the therapy had not progressed to a stage at which they could have joint sessions.

Arnoldo Itzol, the Defendant's father, testified through an interpreter that the Defendant had an older brother and younger sister, that the family lived in California, and that the Defendant grew up there. Mr. Itzol said that the three siblings had always been close. Mr. Itzol stated that the Defendant was a happy and healthy child who never caused trouble, enjoyed playing sports, and was a good student. He said that when the Defendant began school, "the professors really liked him because he was very intelligent, very playful" and that the Defendant received "little certificates" for being a good student. Mr. Itzol stated that the Defendant was popular in school and had many friends, including female friends. When asked whether there was ever an indication that the Defendant had been sexually inappropriate with another person, Mr. Itzol said, "Never, never, never, all the other students would always turn to him because he was a very, very, very studious person."

Mr. Itzol testified that the Defendant began working after graduating from high school and that the Defendant's supervisors "loved him because he worked very hard." He said that after six weeks of working at Ross Dress for Less, the Defendant was promoted to supervisor. Mr. Itzol stated that the Defendant studied to become a surgical technician, that the Defendant told him there were more jobs in Tennessee, and that the Defendant left school and moved. Mr. Itzol stated that the Defendant found work at a roofing company within two weeks of moving to Tennessee and that the Defendant liked the work because he could travel.

Mr. Itzol testified that his family and the Defendant supported one another and that he raised the Defendant to believe in God. He said that the Defendant called his family from jail. Mr. Itzol stated that the Defendant had sent his parents money from the time he began working. Mr. Itzol said,

> To me he's the best child we've had . . . out of the three . . . . he's been very happy, hard working, very honest . . . . I've taught him to respect older people, children and women, and the whole time he's been a person with strong character that's always helped us[.]

Mr. Itzol asked the trial court not to sentence the Defendant to life imprisonment because "my son has always been an honest person . . . this situation is not right, if you can look around and see, the little girl is not sad." He said that upon the Defendant's release from prison, the Defendant would live in his parents' home and that the Defendant would continue working and contributing to the community. Mr. Itzol said, "[My] son is a human being, needs a second chance because . . . he doesn't have a criminal record. He's never bothered, done anything to children . . . And the fact is around our house he grew up around a

lot of children[.]" Mr. Itzol stated that the Defendant never had a drinking problem in California.

The trial court considered the evidence presented at the trial and the sentencing hearing, the presentence report, the purposes of sentencing, the nature of the offense, counsel's arguments, and the Defendant's amenability to rehabilitation. The court found that relative to the conviction for attempt to commit aggravated sexual battery, the Defendant was a Range I, standard offender. The trial court concluded that no mitigating factors applied. *See* T.C.A. § 40-35-113 (2014). The court found that the Defendant had a history of criminal behavior based on the presentence report, which detailed the Defendant's DUI conviction, several non-violent misdemeanor and felony arrests, and prior illegal drug use. The court placed little weight on this factor because the Defendant's previous criminal behavior did not involve violent offenses. *See* T.C.A. § 40-35-114(1) (2010) (amended 2012, 2015) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that enhancement factors (7) and (14) applied because the Defendant committed the offenses "for [sexual] pleasure or excitement" and because the Defendant abused a position of private trust. *See* T.C.A. § 40-35-114(7) (2010) (amended 2012, 2015) ("The offense . . . was committed to gratify the defendant's desire for pleasure or excitement[.]"), 40-35-114(14) (2010) (amended 2012, 2015) ("The defendant abused a position of public or private trust[.]"). The court determined that factor (4) was incorporated into the offenses for which the Defendant was convicted. *See* T.C.A. § 40-35-114(4) (2010) (amended 2012, 2015) ("A victim of the offense was particularly vulnerable because of age."). The court noted that although the victim's mental health was improving, "she still actively experiences panic and/or anxiety attacks."

Relative to consecutive sentencing, the trial court found that the Defendant was in a position of trust as the victim's stepfather, that the offenses occurred during a one and one-half year period, and that "a year or more certainly is torture for the victim," although the duration was of "average length." The court found that multiple types of sexual contact were involved and that the victim suffered psychological damage. The court found that evidence existed to support consecutive sentencing but ordered concurrent service because of the Defendant's "overall social history."

The trial judge stated,

[L]et me just say that but for the hideous acts that [bring the Defendant] before this Court, he for the most part has a very good history, both socially, educationally, work-wise. No one's ever disputed how hard he worked and

-45-

supported his family. His father gave glowing reviews . . . that he was a great student, looked to as a leader, had multiple friends, loving family and everything else, everything but the nature of these crimes, had he been a candidate for alternative sentencing would have certainly almost dictated that he'd be given that opportunity, but that is not available in these cases.

The trial court noted, though, that the "numerous, numerous occasions that these types of events occurred" as well as the applicable enhancement factors made the minimum sentence inappropriate.

Relative to Count 1, the trial court found that the Defendant was a Range I, standard offender and sentenced the Defendant to four years. Relative to Counts 6, 8, 9, and 10, the trial court sentenced the Defendant to twelve years for each count. Relative to Counts 3, 4, 5, and 7, the court sentenced the Defendant to forty years for each count. The court ordered concurrent service of all counts, for an effective sentence of forty years.

At a motion for new trial hearing, the trial court dismissed the conviction for rape of a child corresponding to Count 7, determining that the conviction was based solely upon the Defendant's uncorroborated testimony. However, the court declined to reduce the sentence because of the remaining multiple convictions for rape of a child and aggravated sexual battery.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Before January 1, 2012, the statute governing rape of a child had the following provision relative to sentencing:

[A] person convicted of a first or subsequent violation of this section shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence imposed upon any such person may, if appropriate, exceed twenty-five (25) years, but in no case shall it be less than the minimum period of twenty-five (25) years.

T.C.A. § 39-13-522(b)(2)(A) (2010) (amended 2012). This court has concluded that relative to a Range I offender, the twenty-five-year minimum is also the maximum permissible sentence under the previous version of the statue. *State v. Rhonda Louise Medley*, No. M2009-02466-CCA-R3-CD, 2011 WL 2739512, at *6 (Tenn. Crim. App. July 12, 2012) ("[By] inference, if the defendant is sentenced as a Range I offender, as the maximum sentence for that range is twenty-five years, the sentence to be imposed must be twenty-five years for each offense of rape of a child."). However, on January 1, 2012, Code section 39-13-522(b)(2)(A) was amended to state, "[A] person convicted of a violation of this section shall be punished as a Range II offender; however, the sentence imposed upon such person may, if appropriate, be within Range III but in no case shall it be lower than Range II." T.C.A. § 39-13-522(b)(2)(A) (2012).

The proof at the trial established that the dates of the offenses occurred during a period of time that encompassed the previous and current versions of the rape of a child statute, January 2010 to July 2012. The evidence did not establish specific dates of offenses beyond the period of time contained in the indictment. The indictment lists the date of each rape of a child as "January 1, 2010 [to] July 31, 2012." The victim's testimony reflects that each rape offense occurred while she was living in the Scott Valley duplex. The victim's mother's testimony established that the family lived at the Scott Valley duplex from October 2010 until spring 2012, with the exception of the three months in which the victim's mother and the victim lived in the home on Elissa Drive. The victim also testified that each rape occurred when she was nine or ten years old. Therefore, the record reflects that each rape occurred between October 2010 and the victim's eleventh birthday in March 2012. No further evidence was presented relative to the dates of the offenses or whether each offense occurred before January 1, 2012, or on or after January 1, 2012.

In this case, the version of Code section 39-13-522 effective on January 1, 2012, increased the permissible sentence from between twenty-five and forty years for an individual whose prior felony record established him as a Range I or Range II offender. Because no proof was presented at trial regarding the individual dates of the offenses, the record fails to reflect that the enhanced version of section 39-13-522 applies. The trial court determined that the Defendant was a Range I offender. As a result, we conclude that the trial court erred by sentencing the Defendant pursuant to the enhanced sentencing provision of

Code section 39-13-522 and modify the Defendant's sentence to twenty-five years for each count of rape of a child. Because the trial court made extensive findings of fact regarding consecutive service but chose not to order consecutive sentences[3] and because the applicable law provides no discretion in the length of the sentence, the Defendant's effective sentence is twenty-five years' confinement. We remand the case to the trial court for modification of the judgments to reflect twenty-five years at 100% service for the rape of a child convictions in Counts 3, 4, and 5.

# VIII

## Clerical Error

The Defendant argues and the State concedes that the judgment for Count 6 erroneously reflects that the conviction offense was rape of a child and that the judgment should reflect a conviction for aggravated sexual battery. We agree that the Defendant was convicted of aggravated sexual battery. In addition, our review of the record indicates that the judgment for Count 6 reflects a forty-year sentence but that the court imposed a twelve-year sentence at the sentencing hearing. *See, e.g., State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991) (stating that when a conflict exists between the transcript and the judgment, the transcript controls). We remand the case to the trial court for correction of the judgment. In addition, no judgment form exists for Count 2, which was dismissed, and we remand for entry of a judgment for Count 2 reflecting dismissal. *See* Tenn. R. Crim. P. 32(e)(3).

In consideration of the foregoing and the record as a whole, although we affirm the Defendant's convictions, we modify the sentences relative to the rape of a child convictions in Counts 3, 4, and 5, and remand for entry of amended judgments reflecting sentences of twenty-five years in each count. We also merge Counts 1 and 3 and remand for modification of the judgments reflecting one conviction for rape of a child. Further, although we affirm the conviction in Count 6, we remand for entry of a corrected judgment reflecting a conviction for aggravated sexual battery and a twelve-year sentence.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

---

[3] We note that the State does not appeal the trial court's determination relative to consecutive sentencing. *See* T.C.A. § 40-35-115(C). We also note that the Defendant did not appeal the sentences for his attempted aggravated sexual battery and aggravated sexual battery convictions.